UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

UNITED STATES OF AMERICA

vs.                                            CRIMINAL NO. 3:22CR101(OAW)

MOHAMED KAMASH                                 July 26, 2024

**MR. KAMASH'S MEMORANDUM IN AID OF SENTENCING**

On August 14, 2024, Mohamed Kamash will appear before the Court for sentencing. Mr. Kamash accepts full responsibility for his criminal misconduct and has pled guilty to one count of False Statement in a Naturalization Proceeding in violation of 18 U.S.C. § 1015(a). He respectfully requests that the Court impose a Guidelines sentence of time served (equivalent to approximately two months of imprisonment) followed by one year of supervised release.

**HISTORY, CHARACTERISTICS, & CIRCUMSTANCES OF THE OFFENSE**

**I.     Mr. Kamash's childhood was characterized by war, violence, and destitution.**

As a child, Mohamed was never safe. Bombs, gunshots, and dead bodies were part of daily fabric of Mohamed's childhood. He was born during the last moments of the Gulf War and grew up in the shadow of that war. When he was only 12-years-old, another war started, the Iraq War, which lasted until just before he fled Iraq at age 21.

A.   Born at the end of the Gulf War, Mohamed and his family lived in deep poverty throughout his childhood.

War touched every aspect of Mohamed's life, even before he was born. On January 17, 1991—one month before Mohamed was born—the United States and its coalition began an aerial bombing campaign in Iraq, known as Operation Desert Storm. An estimate of 2,000 Iraqi civilians

were killed during the six-week operation.[1] At the time, Mohamed's family was living in Tal Afar, a small town in Northern Iraq. The danger and risk prevented Mohamed's mother from going to the hospital, so she gave birth to Mohamed at home in February 1991. PSR ¶ 65. When Mohamed was three days old, Operation Desert Storm ended, and, within the first week of his life, the Gulf War officially ended.

Mohamed grew up in the shadow of the Gulf War. The coalition's extensive bombing campaign during the Gulf War, though aimed at military sites, severely damaged key infrastructure, including bridges, roads, power plants, and water treatment facilities.[2] This devastation led to significant long-term disruptions in electricity supply, clean water access, education systems, and sanitation services.[3] The compromised infrastructure not only hindered immediate recovery efforts, but also perpetuated ongoing cycles of poverty and hardship throughout Iraq.[4]

Following the war, the United Nations imposed strict sanctions on Iraq, which included a comprehensive embargo on international trade, the prohibition of all exports from Iraq, and the ban on the import of all goods, except for food and medicine that were deemed essential civilian needs.[5] Though aimed at restricting Saddam Hussein's government, the sanctions had devasting and deadly impacts on Iraqi civilians, including Mohamed and his family.[6] The sanctions severely restricted the import of food and medical supplies, causing critical shortages and escalating prices for essential goods.[7] Food, medicine, and even clean water became scarce. A pair of UNICEF studies estimated

---

[1] Michael O'Hanlon, *Estimating Casualties in a War to Overthrow Saddam*, BROOKINGS INSTITUTE (Jan. 1, 2003) https://www.brookings.edu/articles/estimating-casualties-in-a-war-to-overthrow-saddam/.
[2] NADJE SADIG AL-ALI, IRAQI WOMEN: UNTOLD STORIES FROM 1948 TO THE PRESENT 177 (2013).
[3] *Id.* at 177-78.
[4] *Id.*
[5] S.C. Res. 661 (Aug. 6, 1990).
[6] AL-ALI, *supra* note 2, at 177-78.
[7] *Id.*

that by 1999, there were over 500,000 excess deaths among Iraqi children under five due to malnutrition and preventable diseases.[8] The long-term deprivation of adequate nutrition not only stunted the physical and cognitive development of children, but also left lasting scars on the health and wellbeing of the broader population.[9]

Though economic sanctions made basic goods scarce for everyone, the Kamash family struggled even more than an average Iraqi family. Before the war, oil revenue had been the primary source of funding for public schools.[10] Once the sanctions were imposed, however, oil revenue disappeared, leading to massive budget cuts in education across the country.[11] Schools that had been bombed during the war were not rebuilt.[12] The schools that survived the war had to operate with very few resources, and across the country, teachers' salaries plummeted.[13] Mohamed's father was a school teacher, earning only $2.67 per month. PSR ¶ 65. On that meager salary, his father supported a family of eleven—himself, Mohamed's mother, and their nine children. The Kamash family often did not have necessities like water, electricity, and food. PSR ¶¶ 64-66; Exhibit F (Noha Kamash's Letter to the Court). They primarily subsisted on eggs, since basic foods, like milk, were beyond their means. Exhibit F (Noha Kamash's Letter to the Court). Looking back at that time, Mohamed describes his family as "poor, beyond imagine." PSR ¶ 66.

---

[8] *See* Richard Garfield, *Morbidity and Mortality among Iraqi Children from 1990 through 1998: Assessing the Impact of the Gulf War and Economic Sanctions,* KROC INSTITUTE (Prepared for UNICEF) (Mar. 30 1999); M.M. Ali & I.H. Shah, *Sanctions and childhood mortality in Iraq*, LANCET 1851-57 (May 27, 2000) ("If the substantial reduction in the under-five mortality rate during the 1980s had continued through the 1990s…there would have been half a million fewer deaths of children under-five in the country as a whole during the eight year period 1991 to 1998.").
[9] A. Ascherio, et al., *Effect of the Gulf War on infant and child mortality in Iraq*, 327 NEW ENG. J. OF MED. 931-36 (1992).
[10] Kira Walker, *Once Proud, Iraq's Schools Reel from Decades of Setbacks*, NATURE MIDDLE EAST (Sept. 7, 2014) https://www.natureasia.com/en/nmiddleeast/article/10.1038/nmiddleeast.2014.218.
[11] *Id.*
[12] *Id.*
[13] *Id.*

Throughout childhood, Mohamed experienced the consequences of war. The infrastructure that had been destroyed in war, including water, sanitation, and electricity systems, was not immediately rebuilt.[14] Frequent losses of power and water were part of daily life, and the damaged buildings remained perpetual signs of the fighting.[15] During this time, the international community imposed a no-fly zone over Iraq to prohibit Saddam Hussein's army from harming its own citizens.[16] To do so, international planes were constantly flying overhead, and Mohamed remembers feeling terrified as a child by the booming coming from the sky.[17]

B. In 2005, Mohamed's family fled their home in Tal Afar after the U.S. army dropped leaflets instructing civilians to evacuate.

Mohamed's hometown, Tal Afar, is infamous for its sectarian violence.[18] In 2003, approximately 80 percent of the city was Sunni Muslim and 20 percent Shi'a Muslim.[19] Countrywide, however, Sunni Muslims are a minority, since approximately 60 percent of the country is Shi'a and only 35 percent of the country is Sunni.[20] The Kamash family belongs to the minority Sunni group, an unchosen designation that is inherited from birth.

Though a history of sectarian conflict between Sunni and Shi'a Muslims dates back centuries, the hostilities in Tal Afar were fomented following the Gulf War. Saddam Hussein, a Sunni Muslim, had drafted many Sunni men from Tal Afar, putting the Sunni majority in Tal Afar in a position of

---

[14] AL-ALI, *supra* note 2, at 186.
[15] *Id.* at 177-78.
[16] *Containment: The Iraqi no-fly zones*, BBC News (Dec. 29, 1998, 17:40 GMT) http://news.bbc.co.uk/2/hi/events/crisis_in_the_gulf/forces_and_firepower/244364.stm.
[17] Exhibit A (Mohamed Kamash's Letter to the Court).
[18] Gareth Stansfield, *The Looming Problem of Tal Afar*, WILSON CENTER (Nov. 2016) https://www.wilsoncenter.org/publication/the-looming-problem-tal-afar (describing the fighting as "astonishingly brutal").
[19] *Id.*
[20] David R. Smock, Report, *Religious Politics in Iraq*, U.S. INSTITUTE OF PEACE (May 27, 2003) https://www.usip.org/publications/2003/05/religious-politics-iraq.

power and safety.[21] When Saddam Hussein's government collapsed in 2003, security in Tal Afar devolved and fighting erupted between the sects.[22]

In addition to internal sectarian violence, Tal Afar was viewed as a strategically desirable location since it sat in between Mosul, the largest city in northern Iraq, and the Syrian border.[23] As Al-Qaeda gained power, the group, led by Abu Musab al-Zarqawi, took hold of portions of Tal Afar to secure the path between Syria and the rest of Iraq.[24] American Colonel McMaster, who led the battalion of American soldiers in the area, explained in an interview that "Zarqawi exploited tribal and sectarian divisions among the city's poor and semiliterate population."[25] Between 2003 and 2005, the city dissolved into chaos—Sunni and Shi'a "death squads" systematically killed each other.[26] The police, controlled by the Shiites, kidnapped and killed Sunnis.[27] The *takfirin*, defined as "Sunni extremists who believe that Muslims who don't subscribe to their brand of Islam, especially Shiites, are infidels and should be killed," terrorized the city, leaving headless corpses of Shiites in the streets.[28] In May 2005, there were 210 attacks in Tal Afar—over 7 per day—which accounted for more than ten percent of all attacks in Iraq.[29]

Thousands of people began fleeing from Tal Afar to Mosul. A young woman named Hosneyya Dawoud fled Tal Afar after watching police officers execute a dozen men with their hands in the air.

---

[21] *Id.*
[22] *Id.*
[23] George Packer, *The Lesson of Tal Afar*, NEW YORKER (Apr. 3, 2006) https://www.newyorker.com/magazine/2006/04/10/the-lesson-of-tal-afar.
[24] *Id.*
[25] *Id.* (quoting an interview with Colonel H. R. McMaster).
[26] *Id.*
[27] *Id.*
[28] *Id.*
[29] Mackubin Thomas Owens, *Counterinsurgency From the Bottom Up: Colonel H.R. McMaster and the 3rd Armored Cavalry Regiment in Tel Afar, Spring-Fall 2005*, FOREIGN POLICY RESEATCH INSTITUTE (Mar. 17, 2017) https://www.fpri.org/article/2017/03/counterinsurgency-bottom-colonel-h-r-mcmaster-3rd-armored-cavalry-regiment-tel-afar-spring-fall-2005/.

She said, "In front of my eyes, I saw them fall to their knees soaked in blood after the police and militias sprayed them with gunfire. My husband and his brother went to see what happened, and they haven't come back."[30] One of the most famous images from the Iraq War was taken in Tal Afar in January 2005: a 5-year old girl, screaming and splattered with blood, after her parents were shot in their car while driving in Tal Afar.[31] Indeed, as described below, at just 12 years old, Mr. Kamash experienced the violence and horror of the Iraq War.



Samar Hassan screamed after her parents were killed by U.S. soldiers in Iraq in 2005.   Chris Hondros/Getty Images

In September 2005, the American army invaded Tal Afar in an effort to root out Al-Qaeda and restore peace in the city.[32] The United States military had expelled Al-Qaeda fighters from

---

[30] *Iraqis escape sectarian violence to spartan camp*, REUTERS (Aug. 9, 2007, 5:10 PM EDT) https://www.reuters.com/article/world/iraqis-escape-sectarian-violence-to-spartan-camp-idUSNOA634360/.
[31] *See* Tim Arango, *Face That Screamed War's Pain Looks Back, 6 Hard Years Later*, N.Y. TIMES (May 7, 2011) https://www.nytimes.com/2011/05/07/world/middleeast/07photo.html.
[32] *6 insrugents killed in northern Iraq*, CNN (Sept. 18, 2005, 5:02 PM EDT) https://www.cnn.com/2005/WORLD/meast/09/18/iraq.main/index.html.

Fallujah after six weeks of heavy fighting.[33] But since many Al-Qaeda members had fled from Fallujah to Tal Afar, the United States military prepared to invade Tal Afar.[34] Before the invasion, the army dropped leaflets telling civilians to evacuate the city. PSR ¶ 68.[35] At that point, 14-year-old Mohamed fled Tal Afar with his family and never returned. *Id.*

     C. <u>As a teenager and young adult living in Mosul, Mohamed continued to witness sectarian conflict and violence.</u>

War and violence followed Mohamed and his family, even after they fled the fighting in their hometown. The Iraq War, which had started when Mohamed was 12 years old, spanned Mohamed's teenage years, ending in 2011 when Mohamed was 20 years old.

Before the Iraq War, Saddam Hussein's Sunni-aligned regime had oppressed Shi'a Muslims for many years. When Saddam Hussein's government was toppled in 2003, a Shi'a-led government took over Iraq. Across the country, there was a backlash against Sunni Muslims, regardless of their connection to the previous regime. In Northern Iraq, where Tal Afar and Mosul are located, sectarian violence was especially strong because it is a majority Sunni area, known as the "Sunni Triangle."[36]

Explosions and gun shots were the sounds of daily life in Mosul. On January 3, 2008, there was an explosion in an apartment building that killed 36 people.[37] When Police Chief Salah Mohammed al-Jabouri went to investigate, a suicide bomber dressed as a police officer detonated his bomb, assassinating the police chief.[38] Just a few months later, in May 2008, the United States army

---

[33] *Packer*, *supra* note 23.
[34] *Id.*
[35] *See also* Andrew M. Clark & Thomas B. Christie, *Ready... Ready... Drop!: A Content Analysis of Coalition Leaflets Used in the Iraq War* 67(2) INTERNATIONAL COMMUNICATION GAZETTE 141-154 (2005).
[36] Daily Brief, *IRAQ: Sunni Arab alienation threatens stability*, OXFORD ANALYTICA (Sept. 16, 2003) https://dailybrief.oxan.com/Analysis/DB104157/IRAQ-Sunni-Arab-alienation-threatens-stability.
[37] Solomon Moore, *Suicide Bombing Kills Iraq Police Chief in Mosul*, N.Y. Times (Jan. 25, 2008) https://www.nytimes.com/2008/01/25/world/middleeast/25iraq.html.
[38] *Id.*

led a campaign in Mosul to try to regain control of the city and restore the peace, since the daily violence made life in Mosul unbearable.[39] By October 2008, approximately 2.8 million Iraqis were internally displaced and approximately 2 million more had fled the country, according to the U.S. State Department.[40] Countrywide, the civilian death toll was staggering. In 2007 alone, there were 18,000 civilian deaths.[41]

Mohamed witnessed unimaginable violence and terror as a teenager. Coming home from school one day, he saw three people get shot and start bleeding from their necks. Exhibit A (Mohamed Kamash's Letter to the Court). While on his way to pick up his brother from school, he saw someone else shot at close range in the chest, and Mohamed remembers seeing smoke rising from the bullet hole in the person's body. *Id.* He accidentally discovered a piece of his neighbor's skull with hair on it, after his neighbor, a London-trained, well-respected doctor, was assassinated next door. *Id.*[42] Just walking to buy food, Mohamed remembers seeing bodies lying in the streets—some without heads. *Id.* During this time period, the city of Mosul was described as a "butchery" given the wanton and gruesome violence.[43] People were frequently killed and dismembered for unknown reasons.

---

[39] Eric Hamilton, *The Fight for Mosul: Executive Summary*, INSTITUTE FOR THE STUDY OF WAR (2008) https://www.understandingwar.org/report/fight-mosul.

[40] Media Note, *U.S. Government Reaches Record for Iraqi Refugee Admissions and Humanitarian Assistance in Fiscal Year 2008*, U.S. DEP'T OF STATE (Oct. 2, 2008) https://2001-2009.state.gov/r/pa/prs/ps/2008/oct/110578.htm.

[41] Unami Human Rights Office, *Report on Human Rights in Iraq: 2011*, OFFICE OF THE HIGH COMMISSIONER FOR HUMAN RIGHTS (May 2012).

[42] According to reports, approximately 380 academics and doctors were targeted and killed in Iraq from 2003 to 2006. *See* Clea Caulcutt, *Iraq's Deadly Brain Drain*, FRANCE24 (Jan. 12, 2008) https://web.archive.org/web/20110521200915/http://www.france24.com/en/20080510-iraqs-deadly-brain-drain-iraq.

[43] Andrew Lee Butters, *Losing Mosul? The northern Iraqi city once hailed as a post-war model is on a perilous backslide*, N.Y. TIMES (Oct. 16, 2004) https://web.archive.org/web/20041019000438/http://www.time.com/time/world/article/0,8599,725055,00.html.

## II.    Fleeing danger, Mr. Kamash left his family and life behind in Iraq in search of a safer future in the United States.

Because of death threats, Mohamed fled Iraq and went to Turkey. From there, he applied to come to the United States and arrived here in 2014. While working to support himself and his family in Turkey, Mohamed integrated into the community here in New Haven, earning a reputation as a caring, generous, dependable person.

A.    Without his parents and siblings, Mohamed fled to Turkey to seek asylum in the United States.

The United States military withdrew from Iraq on December 18, 2011, leaving behind an unstable democracy and warring sectarian groups. At the time, the Iraqi parliament was run by Prime Minister Nouri al-Maliki, an Iran-backed Shi'a leader. When Saddam Hussein, a Sunni Muslim, led Iraq, Shi'a Muslims were oppressed. Now that Nouri al-Maliki, a Shi'a Muslim was running Iraq, Sunni Muslims were marginalized. Under both governments, people faced persecution for merely being Shi'a or Sunni, a designation from birth that people cannot control.

Less than 24 hours after American troops left, Prime Minister Nouri al-Maliki issued an arrest warrant for Sunni Vice President Tariq al-Hashimi, accusing him of plotting to kill Maliki.[44] This move was seen as a crackdown on Sunni political figures, exacerbating sectarian divides and sparking widespread protests in Sunni-majority areas, like Mosul.[45] On December 22, 2011, at least 69 civilians were killed and around 200 people injured in coordinated attacks across Iraq, targeting markets, grocery stores, and cafés.[46] That year, at least 2,771 Iraqi civilians were killed and 7,961

---

[44] Dahr Jamail, *Rivals say Maliki leading Iraq to civil war*, AL-JAZEERA (December 28, 2011); *Arrest warrant for Iraq Vice-President Tariq al-Hashemi*, BBC (Dec. 20, 2011) https://www.bbc.com/news/world-middle-east-16256830.
[45] *Thousands protest in Iraq again vice president's arrest warrant*, AL ARABIYA (Dec. 23, 2011) https://english.alarabiya.net/articles/2011%2F12%2F23%2F184198.
[46] Unami Human Rights Office, *supra* note 41.

were injured in attacks, including ones that deliberately targeted officials, judges, religious figures, and education professionals, like Mohamed's father.[47]

This post-war environment, along with the Arab Spring protests unfolding across the Middle East, fostered unrest and violence.[48] The political and social backlash against Sunni Muslims, like Mohamed and his family, laid the groundwork for the emergence of the Islamic State of Iraq and Syria (ISIS) two years later in 2014. In retrospect, scholars point to Prime Minister Nouri al-Maliki's leadership in 2012 as "the single most important factor in driving the rise of ISIS."[49] That year, under Maliki's guidance, thousands of Sunnis were arrested without charges, Sunnis were removed from every position of authority and replaced with Shiites loyal to Maliki, and violent attacks against Sunni communities escalated.[50] The legal system in Iraq did not offer an avenue to safety and justice for Sunnis because the judiciary had been gutted of Sunnis and stacked with Shiite loyalists.[51] One of Maliki's most consequential choices was to dismantle the Sons of Iraq, a Sunni armed forces that had been recruited to fight against Sunni-identifying extremist groups like Al-Qaeda.[52] The Sons of Iraq had been promised weapons, a salary, and eventual integration into the Iraqi military by Maliki.[53] Stripping moderate Sunnis, who had been recruited to fight against extremism, of their guns was understood as a sign that no Sunni—regardless of religious or political affiliations—was welcome in

---

[47] *Id.*
[48] Charles Recknagel, *What Drives Sunni Anger in Iraq?* RADIO FREE EUROPE (June 23, 2014, 12:30 GMT) https://www.rferl.org/a/iraq-sunni-anger-causes/25432218.html.
[49] Munqith Dagher, et al., *ISIS in Iraq: The Social and Psychological Foundations of Terror* 64 (2023)
[50] *Id.* at 65-66.
[51] *Id.* at 66.
[52] *Id.* at 66-67.
[53] *Id.*

Maliki's post-war Iraq.[54] Capitalizing on the violence and humiliation experienced by Sunni Muslims, the group that would become ISIS, slowly began to recruit young Sunni men.[55]

Mohamed turned 20 years old, as this sectarian and political turmoil unfolded around him. Parts of Mosul were controlled by Sunni-affiliated groups and other neighborhoods were run by Shi'a-affiliated groups. Wherever you lived, the group that controlled your neighborhood expected perfect loyalty. The price of disloyalty was death. In 2012, Mohamed observed suspicious activity at one of the checkpoints in Mosul. Exhibit A (Mohamed Kamash's Letter to the Court). As an upstanding, responsible citizen, Mohamed attempted to report the suspicious activity to the local police. *Id.* Given the high tensions, however, one step out of line could cost someone their life, and it turned out that calling the police was a step out of line. Mohamed began receiving calls from members of the group controlling his neighborhood threatening to kill him. *Id.* Afraid for his life, Mohamed fled Iraq and never returned. *Id.* In Turkey, Mohamed applied for asylum in the United States. He worked in Turkey for two years until he got approval to enter the United States. PSR ¶¶ 69-70.

B.  In 2014, Mohamed arrived in the United States, the first country where he felt welcomed and safe.

On July 1, 2014, Mohamed arrived at John F. Kennedy International Airport. PSR ¶ 70. With barely enough to cover bus fare, Mohamed traveled to Integrated Refugee & Immigrant Services (IRIS) in New Haven, Connecticut. *Id.* Mohamed felt like the United States was the first country that embraced him—he did not have to worry about bombings, headless corpses, or people threatening to kill him. For the first time in his life, he felt safe.

---

[54] *Id.*
[55] *Id.*

11

Mr. Kamash took every opportunity to establish his life here in New Haven. Only two days after arriving, Mohamed started English classes, and within three months, he had passed all of the available classes. PSR ¶ 70; Exhibit A (Mohamed Kamash's Letter to the Court). Eager to start building his new life, Mr. Kamash began working immediately after he finished classes. *Id.*

While working, Mr. Kamash signed up for every optional program that IRIS offered, including the Cultural Companions program that pairs new refugees with local volunteers to practice English, learn about American customs, and explore New Haven together. Exhibit J (Chris George's Letter to the Court). The coordinator of the program, Laurel McCormack, writes that "Mohamed was one of the only young men to ever sign up and full-heartedly participate in the program during the seven years I ran it." Exhibit H (Laurel McCormack's Letter to the Court).

C. <u>Mr. Kamash worked hard to integrate into the community, support himself, and send money back home to his family.</u>

As Mr. Kamash settled into the community in New Haven, his work ethic, selflessness, and dedication to others became quickly apparent to everyone who met him. He worked consistently, often balancing multiple jobs at once. PSR ¶¶ 88-89. Madeleine Le Strange, who taught English classes at IRIS for many years, described her first impression of Mohamed as "a young, hard-working man who was motivated to start his new life in New Haven." Exhibit I (Madeleine Le Strange's Letter to the Court). Building a new life was not easy. He, like many others who have come to the United States seeking refuge, had to work extra hard to secure employment, build community, and navigate a new culture thousands of miles away from his family. But his "perseverance and adaptability are evidence in his successful integration into the community and his contributions to helping others." Exhibit B (Brooke Conley's Letter to the Court).

Mohamed has demonstrated a humble dedication to others and his community. Laurel McCormack, a case manager at IRIS, described Mohamed's transformation from "a community-involved newcomer to a community-minded volunteer." Exhibit H (Laurel McCormack's Letter to the Court). Once Mohamed saved up to buy his own car, he immediately began to volunteer with IRIS—driving newcomer families to appointments, helping new refugees find affordable housing in Connecticut, and serving as a translator for those, like Mohamed, who arrived without knowing English. Exhibit J (Chris George's Letter to the Court). Reflecting on Mohamed's immeasurable support to other families, Laurel McCormack explains: "It became clear to me that Mohamed maintained a sense of responsibility and care for the wider refugee and immigrant community, wanting to help other newcomers to learn to appreciate and navigate their new home the way he had come to do so." Exhibit H (Laurel McCormack's Letter to the Court).

In addition to volunteering his time, Mohamed participated regularly in the IRIS soccer club, playing pickup soccer games almost every week on Saturdays for two years. Exhibit K (Stephen Johnson's Letter to the Court); PSR ¶ 71. Since he was not involved with the Muslim community here in New Haven, the soccer club served as an important source of community for Mohamed. Through weekly soccer scrimmages, Mohamed served as a role model for other young adults in the community, advising them on their soccer skills, modeling sportsmanship attitude, and mentoring them off the soccer field. Exhibit J (Chris George's Letter to the Court).

Mr. Kamash's selflessness is well known in his community. He is the person that people turn to when something goes wrong or someone needs advice. Exhibit L (Mohammed Shaboo's Letter to the Court). He helps in whatever way he can, whether it is volunteering as a handy man, helping people fix their cars, driving people to appointments, or just providing a listening ear to those around him. *Id.* When he saw an older man carrying groceries to the car, Mohamed dropped his bags and ran

over to help the man. Exhibit G (Ihsan Ahmed's Letter to the Court). When his uncle wanted to get rid of his furniture, Mohamed arranged for the furniture to be given to a new refugee family that was arriving with nothing. *Id.* His friend Ali, here in New Haven, could not get a drivers license because he lost his green card, and he could not figure out how to get a new one. Exhibit M (Ali A La-Rudani's Letter to the Court). Just two days after returning home from Wyatt, Mohamed drove Ali to the courthouse and helped him apply for a temporary green card. *Id.* When someone is in need, Mohamed does whatever he can to support them.

Even though Mr. Kamash has limited resources, he always prioritizes helping others in need. When Mr. Shaboo's father passed away, Mr. Kamash helped pay for over 50 percent of the costs of the funeral and burial services. *Id.* Mr. Shaboo struggled after his father's death, and Mr. Kamash took care of Mr. Shaboo, driving him to work or wherever else he needed to go for two years. *Id.* Stephen Johnson, who met Mohamed when he was a manager at IRIS, describes the emotional support that Mohamed provided: "[H]is kindness and his story have had an outsized impact on my life. When my younger sister passed away from suicide in 2015, my grief was overwhelming. I will never forget the support and embrace he showed me when I shared the difficult news." Exhibit K (Stephen Johnson's Letter to the Court). Mr. Kamash needed money when he left Wyatt, so he decided to sell his car. Instead of selling the car to the person with the highest offer, Mr. Kamash sold his car to a new Syrian family at a lower price to help them care for their kids, one of whom had cancer. Exhibit G (Ihsan Ahmed's Letter to the Court). These are just a few of the several instances where Mohamed, expecting nothing in return, stepped up to take care of the people around him.

Many people that Mohamed has met since arriving in New Haven have commented on Mohamed's extraordinary reputation for kindness and generosity towards others:

- "Mr. Kamash is a caring and observant individual who shows genuine concern for others. He is the kind of person who notices if someone is not

14

feeling well or is in need and will offer help." Exhibit B (Brooke Conley's Letter to the Court).

- "He always [helped others] without a hint of superiority but rather with humility, and with a gentleness and respect for each person he met, from children to elders… He did these things without any gain for himself, beyond having a loyal set of friends who, like me, valued Mohamed for his deep kindness and his generosity in offering his time and a listening ear to those around him." Exhibit H (Laurel McCormack's Letter to the Court).

- "[Mohamed] has shown himself in every way to be a generous, community-minded, kind, law-abiding, and upstanding member of the New Haven community." Exhibit J (Chris George's Letter to the Court).

- "[T]he United states of America has been built from hard workers, sacrifice, and good people coming together. Mr. Kamash is one of those people." Exhibit L (Mohammed Shaboo's Letter to the Court).

Mr. Kamash has also consistently supported his mother and two youngest brothers. Exhibit D (Muna Ahmed's Letter to the Court); Exhibit E (Abdlla Kamash's Letter to the Court). Since his father's whereabouts are unknown, it is Mohamed's responsibility to care for his mother and younger, unmarried siblings. *Id.* He began sending money back to his family as soon as he could, and he has continued to financially support his mother and younger brothers throughout his time in the United States. *Id.*

D.  <u>In 2020, Mohamed married Fadila, and they welcomed a baby boy in 2021.</u>

Mohamed has known his now-wife for many years. When they decided to get married, Mohamed returned to Turkey for the wedding. Exhibit C (Fadila Kamash's Letter to the Court). In March 2021, Mohamed and his wife got married at a small ceremony in Turkey. *Id.* Fadila had complications with her pregnancy, and Mohamed flew back to Turkey to be there for the birth. *Id.* Soon after, in January 2022, Mohamed and Fadila's son was born. *Id.*

Though he is far away, Mohamed is closely connected to his wife and son. Fadila describes Mohamed as the "most supportive and loving husband" and "a present father despite the distance."

15

Exhibit C (Fadila Kamash's Letter to the Court). He speaks to them regularly, and often video chats with his son. He financially supports his wife and son in Turkey by sending whatever he can to cover their basic needs. Fadila explains: "Mohamed helps the poor and needy… He keeps his family close to his heart as we do. Mohamed is a selfless person." Exhibit C (Fadila Kamash's Letter to the Court).

As soon as he could, Mohamed filed the necessary paperwork in the hopes of bringing his wife and son to the United States. His wife writes that "Mohamed has great respect and love for America. He has moved between countries and feels like America is the first country to embrace him." Exhibit C (Fadila Kamash's Letter to the Court). He and his wife hope to be able to build a future here, together.

**III.    After living and working in the United States for many years, Mr. Kamash sought to become a citizen through naturalization.**

In another step towards putting down roots in the United States, Mr. Kamash applied for a green card and began the naturalization process. On the other side of the world, war, violence, and terror continued to ravish Mosul and Iraq more generally. Growing up, Mohamed had always tried to remain neutral and uninvolved in the sectarian and political conflict around him. So he tried to distance himself from his old life and worked to establish a new, free life here in the United States.

A.  <u>Mr. Kamash answered an interview question falsely, a choice he deeply regrets.</u>

Two years after Mohamed fled Iraq, ISIS began to capture territory in Iraq. During Maliki's crackdown on Sunni Muslims in 2012, the remnants of Al-Qaeda leadership in Iraq regrouped and rebranded, changing the group's name to the Islamic State of Iraq (ISI). In 2013, the group focused on fighting in Syria, so the group changed their name to the Islamic State of Iraq and Syria (ISIS).

In June 2014, ISIS captured global attention when it captured Mosul, the second largest city in Iraq. After 6 days of fighting, the Iraqi army withdrew from the city, leaving millions of people trapped under ISIS control. Half a million people attempted to escape by foot or car over the course

of two days. Everyone who was not able to escape became a de facto prisoner in Mosul. The city was sealed, and residents were forbidden from leaving the city unless they gave ISIS a "collateral," such as a family member, personal wealth, or property. Only once someone gave ISIS a collateral could a person pay a small fortune to get permission to leave the city for three days. The price for permanently leaving was even higher. If someone did not return after three days, ISIS would seize their property and kill their family. These "policies" made it impossible to flee. ISIS controlled Mosul for three years. The ISIS city "government" was completely dysfunctional—people frequently lost power, the city's water supply was tainted, and everyone lost access to basic food and healthcare.

A few months after ISIS took control of Mosul, Mohamed's brother Ahmed, then 15 years old, sent Mohamed a Facebook message that said (translated from Arabic): "I joined ISIS, and they gave me this pistol." PSR ¶ 27. Ahmed sent that same message to his brother Ali, then 17 years old. *Id.* at ¶ 28. Over the course of the next year and half, Ahmed and Ali remained in contact, and Ahmed sent Ali pictures that indicated Ahmed's involvement in ISIS. *Id.* at ¶¶ 28-30 (Mohamed only learned of these messages between Ahmed and Ali over six years later through this case.)

Sadly, it was not uncommon for teenage boys and young men trapped in Iraq to affiliate with ISIS. Scholars explain that "ISIS implemented a significant campaign of child indoctrination via a relatively well-institutionalized education system," including through public school education.[56] Approximately 150,000 students (one-third of school-age kids living under ISIS control) attended schools where ISIS's elaborate, developed curricula were taught.[57] Outside of school, ISIS recruited teenagers through an extensive social media campaign.[58] Their target audience was Sunni teenage

---

[56] Marion Deslandes-Martineau, et al., *The Programming Curriculum within ISIS* 17(4) PLOS ONE (2022).
[57] *Id.*
[58] *See* Lisa Blaker, *The Islamic State's Use of Online Social Media* 1(1) MILITARY CYBER AFFAIRS (2016).

boys who had experienced violence and oppression under Maliki's regime.[59] Fifteen year old Ahmed fit the bill perfectly.

While ISIS was holding the residents of Mosul captive, Mohamed was beginning to build his new life in the United States. He learned English, worked different jobs, volunteered with IRIS, and played soccer on the weekends. After living in New Haven for one year, he filled out the USCIS I-4 form to apply for a green card. PSR ¶¶ 12-13. He was so grateful that he had escaped Iraq and that he could live a safe, free life here in the United States.

In April 2016, Mohamed learned that Ahmed had died, though he only later found out about the circumstances of Ahmed's death. PSR ¶ 24. Mohamed changed his Facebook profile picture to a photo of Ahmed in his memory. Another account, not Mohamed's, posted a photo of Ahmed and tagged Mohamed's account in the post. *Id.*

On May 1, 2016, Ali and Mohamed had a conversation through direct messages on Facebook. After a brief exchange of greetings, Ali said (in Arabic): "Muhammad, hardest thing, but don't be too hard on yourself, I'm not sure yet, but I'll go along the path of the late Ahmed until I get him there."[60] Mohamed resigned himself to the fact that he was too far away to prevent his brother from whatever he was planning to do. He responded to Ali's statement (in Arabic): "Don't worry about me."[61] He told Ali to go talk to their parents about it. Soon after, Mohamed cut off contact with his brother—he wanted to focus on his future here in America.

---

[59] *Id.*

[60] The messages were written in Arabic. Undersigned counsel obtained this translation from Interpreters and Translators, Inc., an independent translation service.

[61] This translation, received from Interpreters and Translators, Inc., is different than the FBI's paraphrased translation of the conversation that suggests that Mohamed said that "he did not mind." PSR ¶ 36.

In January 2017, Mohamed was part of a family group chat on Facebook. PSR ¶ 33. Between January 29, 2017 at 5:16 AM and January 30, 2017 at 2:53 PM, there were 312 messages sent in the family group chat. *Id.* One message—not sent by Mohamed—contained a picture of Ahmed with three other boys, one of whom was wearing a headband with an ISIS flag. *Id.* Mohamed sent an unrelated video to the highly active group chat eight minutes later. *Id.*

May 29, 2017 was the last time that there was communication between Mohamed and Ali. PSR ¶ 37. (He had stopped talking to Ali individually, but they were still in the same family group chats.) Ali last used Facebook on July 8, 2017, and it is unknown whether he is still alive. *Id.* At the end of 2017, ISIS had lost 95 percent of its territory and no longer controlled Mosul.[62] On December 9, 2017, Iraq declared a final victory over ISIS (though ISIS remained in Syria).[63]

In January 2018, Mohamed was part of a 12-account family Facebook chat. PSR ¶ 34. Someone—not Mohamed—sent a video montage of Ahmed, who had died two years earlier. *Id.* The video montage included pictures of Ahmed with guns and the last image was the ISIS logo. *Id.* On December 19, 2018, President Donald Trump declared that ISIS was fully defeated, both in Iraq and Syria.[64]

In April 2019, Mohamed submitted a USCIS Form N-400, Application for Naturalization. PSR ¶ 14. On the form, it asked: Have you EVER been a member of, or in any way associated (either

---

[62] *Timeline: the Rise, Spread and Fall of the Islamic State*, WILSON CENTER (Oct. 28, 2019) https://www.wilsoncenter.org/article/timeline-the-rise-spread-and-fall-the-islamic-state.
[63] Maher Chmaytelli & Ahmed Aboulenein, *Iraq Declares Final Victory of Islamic State*, REUTERS (Dec. 9, 2017, 12:59 PM EST) https://www.reuters.com/article/world/iraq-declares-final-victory-over-islamic-state-idUSKBN1E30B6/.
[64] *Timeline: the Rise, Spread and Fall of the Islamic State*, WILSON CENTER (Oct. 28, 2019) https://www.wilsoncenter.org/article/timeline-the-rise-spread-and-fall-the-islamic-state.

directly or indirectly) with a terrorist organization?" The question allows the applicant to check boxes labeled either "Yes" or "No." Mohamed checked the "No" box.

On August 17, 2021, Mohamed had an interview with USCIS in support of his naturalization application, nine years after he fled Iraq, over five years since Ahmed had died, and more than four years since his last contact with Ali. The interview took place in English, without an interpreter. During the interview, Mohamed said that his brother, Ahmed, had been killed in Iraq and that he was not in contact with his brother, Ali. The interviewer and Mohamed then had the following exchange:

> Interviewer: Have you ever been a member of, involved with, or in any way been associated with any organizations, associations, funds, foundations, parties, clubs, societies or similar groups in the United States or in any other location in the world? Is there any kind of group, good group, bad group, does not matter?
>
> Mohamed: I always want to stay by myself.
>
> Interviewer: Have you ever been a member of or in any way associated with the communist party?
>
> Mohamed: No.
>
> Interviewer: Or any other totalitarian parties?
>
> Mohamed: No
>
> Interviewer: Or any terrorist organizations?
>
> Mohamed: No.
>
> Interviewer: Have you ever known anybody that was involved in a terrorist organization?
>
> Mohamed: No.
>
> Interviewer: Do you have any family members that were ever involved in terrorist organizations?
>
> Mohamed: No.

He knew that his brothers may have been affiliated with ISIS, and he did not want to be associated with their terrible choices. He was worried that if he said "I don't know" or "Yes" that he would lose his citizenship. So, he chose to answer the question "No," a decision he deeply regrets.

In his letter to the Court, Mr. Kamash takes responsibility and demonstrates sincere regret for his choice:

> I am Mohamed Kamash. I apologize for what I have done. I wanted to escape problems. I know what my brothers may have done is not a good thing, and I didn't want it to be associated with it. I felt like if I said "I don't know" or "yes" they would have denied my citizenship. I didn't want to lose my citizenship because of my brother. I made a bad choice because I was scared. I had fled my country for my life, and I felt like I need this.
>
> I would do it all differently. Now I understand. I just came here to work hard to make a better life.

Exhibit A (Mohamed Kamash's Letter to the Court).

B. <u>After returning from his son's birth in Turkey, Mr. Kamash was arrested and then incarcerated in Wyatt for almost two months.</u>

Mr. Kamash traveled to Turkey for the birth of his son and to help his wife, Fadila Kamash, through an emergency early delivery. Immediately upon his return to the United States, Mr. Kamash was arrested at the John F. Kennedy International Airport on May 5, 2022. PSR ¶ 38. Unable to notify his family of what had happened, Mr. Kamash was transferred to Donald W. Wyatt Detention Facility. For the first two weeks of his incarceration, he was placed in a room by himself with small windows that were covered. Exhibit A (Mohamed Kamash's Letter to the Court). The room had a toilet, shower, and bed—it was smaller than a parking space. He did not see daylight for over two weeks. Mr. Kamash was then transferred to a block, where he lived with other people. Like always, he tried his best to make the most out of the situation, learning Spanish so that he could communicate with his cellmates who did not speak English. Exhibit H (Laurel McCormack's Letter to the Court).

21

In addition to the incarceration itself, Mr. Kamash experienced mental anguish. He had never been incarcerated before, which intensified his disorientation and fear. He struggled to sleep and often felt like he would lose his mind. He was worried about his case and what that would mean for his brand-new son's future. Not being able to contact his family exacerbated Mr. Kamash's feelings of despair.

On June 30, after almost two months at Wyatt, Mr. Kamash was released on bond with strict monitoring conditions. PSR ¶ 4. Though he did not have any immediate family here in the United States, eight people came forward to sign his bond—a true sign of the trust that Mohamed had built with several people in the New Haven community. Many people felt indebted to Mohamed for all of the kindness he had shown them and wanted to help him in his time of need. In a letter to the Court, Mr. Shaboo writes that Mr. Kamash was someone that everyone relied upon and that he feels that now it is his turn to help Mr. Kamash. Exhibit L (Mohammed Shaboo's Letter to the Court). Madeleine Le Strange, who met Mr. Kamash through IRIS, writes: "My trust and confidence in Mohamed's character was evident by my signing of his bond paperwork." Exhibit I (Madeleine Le Strange's Letter to the Court). Even though Mr. Kamash came to the United States alone, he is not here alone. He has created a network of people, who care for him as they would a family member. Exhibit L (Mohammed Shaboo's Letter to the Court) ("Throughout the years, Mr. Kamash became like a big brother. If he were older, I would say he was like a father figure to me.")

C. <u>Since his release from Wyatt, Mr. Kamash has faced significant challenges, yet has maintained perfect compliance with his pre-trial release conditions.</u>

Life over the past two years has been exceedingly difficult for Mr. Kamash. He has navigated losing his housing multiple times, never on his own accord. When he first returned home from Wyatt, his landlord kicked him and his roommate out because she "didn't want any criminals." He and his roommate then rented an apartment, but soon learned that the person they thought was the landlord

(who had already collected two months of rent from them) was, in fact, a tenant who had not been paying rent. Mr. Kamash returned home from work one day to find the apartment locked and emptied of all of his possessions. He had to live out of his car for a few days until he and his roommate could find another place. Now, he lives in a basement unit with no windows and ceilings so low that he cannot stand up straight.

Mohamed's bad luck did not end there. In the past two years, Mr. Kamash sprained his ankle while working at Amazon, requiring physical therapy. He was in a car crash just two months ago that damaged his lower back. Debt piled up while he was at Wyatt and he got blocked from MoneyGram, the platform he used to send money back to his family in Turkey. He is the sole financial supporter for his mother, his two youngest brothers, his wife, and newborn son. Because he could not transfer money, he borrowed money from other family members to pay exorbitant fees to get diapers, food, and the basics delivered to his family in Turkey.

When his son was eight months old, his son got RSV and required hospitalization. Because his wife and son are refugees in Turkey, they could not get treated in standard Turkish hospitals. His wife explains: "Our son almost died in my hands from pneumonia…I was forced for two months to go to hospitals and beg for my son to be treated." Exhibit C (Fadila Kamash's Letter to the Court). She finally found a doctor who could help their son, but Mr. Kamash had to pay $2500 per week, twice, for his son to receive lifesaving care through a private hospital. PSR ¶ 76.

Despite the non-stop hardship, Mohamed has demonstrated "remarkable resilience" and "willingness to accept support." Exhibit B (Brooke Conley's Letter to the Court). He engaged actively in therapy, building coping mechanisms and strategies for stress relief, given the intense stressors in his life. He received mental health support from both IRIS and MAAS, and fully completed the requirements of both programs. PSR ¶ 6.

Through this all, Mr. Kamash has continued to work hard. PSR ¶ 8. Mr. Kamash has been on pre-trial release with restrictive conditions, including an ankle monitor, for over two years, making it more challenging to secure housing and find additional jobs. Yet, he has had perfect compliance with his conditions of release, and the Court has even modified his conditions to allow Mr. Kamash to travel to other states. PSR ¶ 7. While on supervision, Mr. Kamash has continued to demonstrate that he is a hard-working, respectful, generous person, further confirming his reputation in the community.

## LEGAL ARGUMENT

**I.      The governing legal standard requires the Court to impose a sentence that is minimally sufficient to accomplish the purposes of a criminal sentence.**

Pursuant to 18 U.S.C. § 3553, the Court is required to impose, in each case, a sentence that is "sufficient but not greater than necessary, to comply with the purposes set forth" in 18 U.S.C. § 3553(a)(2). Those purposes reflect the need for the sentence that is imposed:

(A)      to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B)      to afford adequate deterrence to criminal conduct;

(C)      to protect the public from further crimes of the defendant; and

(D)      to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner[.]

18 U.S.C. § 3553(a)(2).

In determining what sentence will best achieve these purposes in each case, the sentencing court must consider the following factors:

1. The nature and circumstances of the offense and the history and characteristics of the defendant;
2. The kinds of sentences available and the applicable sentence under the Sentencing Guidelines;
3. Pertinent policy statements issued by the Sentencing Commission;
4. The need to avoid unwarranted sentence disparities among similar defendants guilty of similar conduct; and
5. The need to provide restitution to any victims.

U.S.C. § 3553(a)(1), (a)(3)-(a)(7).

24

While the Court is required to consider the range of penalties suggested by the Sentencing Guidelines in determining the appropriate sentence in a given case, the Court is not bound by that range. *See United States v. Crosby*, 397 F.3d 103 (2d Cir. 2005). Sentencing courts are free to disagree with the Guidelines' recommended sentence and may impose a different sentence based on a contrary view of what is appropriate under § 3553(a).

In determining an appropriate sentence, the sentencing court must apply the "parsimony clause" set forth in 18 U.S.C. § 3553(a), which provides that courts "shall impose a sentence sufficient, but not greater than necessary" to comply with the purposes of sentencing. The Second Circuit explained in *United States v. Ministro-Tapia*, 470 F.3d 137 (2d Cir. 2006), that if the Court believes a lower sentence will be as effective as a higher sentence in serving the purposes of sentencing, it must choose the lower sentence. *See id.* at 142 (stating that where a Guidelines sentence is "in equipoise with [a] below-the-range sentence," the parsimony clause requires imposition of the lower sentence).

## II.    Mr. Kamash has already served a Guidelines sentence, and a sentence of time served would be an above average sentence for this type of offense.

The government, probation, and undersigned counsel all agree that the Guidelines sentence here is zero to six months. Doc. No. 81 (Plea Agreement); PSR ¶¶ 96, 125. Mr. Kamash was incarcerated at Wyatt from May 5, 2022 to June 30, 2022. PSR ¶¶ 4, 125. Thus, a sentence of time served, equivalent to approximately two months, falls within the Guidelines range.

Importantly, a sentence of time served would be an *above average* sentence on multiple fronts. First, for defendants nation-wide who share Mr. Kamash's Guidelines calculations of Criminal

History Category I and offense level 4, the median sentence is zero prison time.[65] Half or more of the people with the same Guidelines calculations received *no* measurable prison time—not even time served. Since the Guidelines here fall in Zone A, "a sentence of imprisonment is not required, unless the applicable guideline in Chapter Two expressly requires such a term." USSG § 5C1.1. Chapter Two does not require a term of imprisonment in this case. Rather, for a Zone A sentence, the Guidelines allow the following types of sentences: a fine only, a sentence of probation (with or without a condition of community confinement or home detention), or a sentence of imprisonment.

Second, Mr. Kamash's two months of incarceration is a longer sentence than comparable cases in the Second Circuit. In *United States v. Terrazas*, for instance, the Court imposed a sentence of three years of probation following a one-day bench trial for making a false statement during an immigration interview. 364 F. App'x 706 (2d Cir. 2010), SDNY 07CR776.

Finally, a time served sentence would be harsher than comparable cases in this District. In *United States v. Mamadjonov*, a jury convicted Mr. Mamadjonov on four counts of making false statements about his brother's involvement in a terrorist organization. No. 3:18-CR-00034(VAB) (D. Conn. Mar. 7, 2023). Mr. Mamadjonov made false statements to the FBI on three separate occasions and during an interview with USCIS. Last month, United States District Court Judge Victor Bolden sentenced Mr. Mamadjonov to time served (the equivalent of one month) and one year of supervised release. *United States v. Mamadjonov*, No. 3:18-CR-00034(VAB) (D. Conn. July 10, 2024).

Mr. Kamash's incarceration has already been double the length of Mr. Mamadjonov's incarceration. Unlike Mr. Mamadjonov's four counts of making a false statement, Mr. Kamash has one count of making a false statement. Moreover, throughout this case, the government has

---

[65] According to USSC's Judiciary Sentencing Information Platform.

26

consistently taken the stand that Mr. Kamash's brothers—not Mr. Kamash—were involved in a terrorist organization. Furthermore, unlike Mr. Mamadjonov's choice to go to trial, Mr. Kamash pled guilty, demonstrating that he is taking full responsibility and saving the Court from expending additional time and resources.

Judge Bolden found that the appropriate Guidelines range for Mr. Mamadjonov was six to twelve months, given that Mr. Mamadjonov's statements impeded the FBI's investigation. Mr. Mamadjonov chose to go to trial instead of pleading guilty, and a jury convicted Mr. Mamadjonov on four counts. Judge Bolden departed from the calculated Guidelines range and imposed a sentence of time served (the equivalent of one month).

Here, the appropriate Guidelines range is lower than in Mr. Mamadjonov's case. Moreover, Mr. Kamash's underlying conduct was far less problematic than Mr. Mamadjonov's and Mr. Kamash took responsibility for his actions. Despite the fact that these differences suggest that Mr. Kamash should receive a lighter sentence, Mr. Kamash has already been punished more than Mr. Mamadjonov. Thus, even a sentence of time served would be disproportionately harsh relative to similarly situated cases in this District.

## III. A Guidelines sentence of time served will best serve the goals of sentencing under § 3533(a).

In order to determine an appropriate sentence, the Court must turn to the § 3353(a) factors. Here, the goals of sentencing weigh in favor of a sentence of time served, as opposed to a sentence with additional incarceration which would be both superfluous and contrary to the goals of sentencing.

A. The nature and circumstances of Mr. Kamash's offense, as well as his history and characteristics, support a sentence of time served and one year of supervised release.

Mr. Kamash's history reflects a lifetime of exposure to war, violence, and insecurity. He fled war in 2005 when extremists took over his hometown. He again fled violence in 2012 when people

27

threatened to kill him. Growing up with war planes buzzing overhead and dead bodies in the streets, Mr. Kamash never felt safe until he arrived in the United States. He was so grateful for the opportunity to build a life here and hoped to bring his family here so that they, too, could be safe and secure.

Given Mr. Kamash's well-founded fear of violence in his home country, he was desperate to stay in the United States. The chance to build a life here in the United States was so precious, and he was scared that if he acknowledged his brothers' involvement in terror organizations, he would be denied citizenship. Mr. Kamash now understands that he made the wrong choice and apologizes for his conduct. His choice to make a false statement came from a place of fear, the very reason why Mr. Kamash fled to the United States in the first place.

Moreover, Mr. Kamash has demonstrated through his actions over the course of his lifetime that his false statement was an aberration. His community, including his family and friends, know him to be an upstanding, law-abiding person, who has never encountered any legal problems. Countless people writing to the Court expressed their shock and surprise that Mr. Kamash had this case. *See, e.g.*, Exhibit C (Fadila Kamash's Letter to the Court) ("I was utterly shocked that he had legal troubles, especially someone like him."); Exhibit F (Noha Kamash's Letter to the Court) ("When I learned about his legal case, I did not understand what was happening. We lived the worst days of our life and were shocked because he has never been in any problems."); Exhibit G (Ihsan Ahmed's Letter to the Court) ("I was shocked when I heard about Mohamed's arrest. It is out of his character to be in any trouble."); Exhibit H (Laurel McCormack's Letter to the Court) ("When an IRIS coworker alerted me of Mohamed's legal situation in the summer of 2022, I was utterly shocked by the charge against him. I had always known him to be an extremely trustworthy and honest person."); Exhibit I (Madeleine Le Strange's Letter to the Court) ("I was quite surprised and concerned… Like several IRIS colleagues, I wanted to rally behind and support him through this crisis.").

28

Not only is he known to be an ethical, trustworthy person, he also supports so many people around him, whether volunteering his time, assisting someone financially, or providing emotional support to those in need. Simply put, Mohamed's actions have repeatedly demonstrated that he is an unusually kind and generous person.

B.  <u>Time served and a one-year term of supervised release will provide just punishment, reflect the seriousness of the offense, and promote respect for the law.</u>

Mr. Kamash has been severely punished. Punishment is not measured in a vacuum, but rather against the individual. Given that Mr. Kamash has never had any legal trouble, he experienced his two months of incarceration as an extreme punishment. When he arrived at Wyatt, he was placed in solitary confinement for two weeks, in a room smaller than a parking space, until his placement within the prison was determined. During that time, he was absolutely terrified. He was given food through a slot in the door, which made him feel like he was an animal. The experience of incarceration was completely foreign to him, and he was in shock about what was happening to him. Since Mr. Kamash had never been incarcerated before, two months at Wyatt was an extremely harsh punishment for him.

Furthermore, all things considered, Mr. Kamash has endured much more than mere incarceration. He has experienced the stress of an ongoing federal criminal case, fear of deportation, anxiety about his family's future and safety, and shame for what he has done. He has also suffered numerous downstream consequences for his actions, including losing his housing, navigating the additional financial stress of this case, and living with the stigma of an ankle monitor for two years.

Mr. Kamash understands the seriousness of his offense and takes full responsibility for his actions. The time he has already spent incarcerated reflects, and may even surpass, the seriousness of the offense. Similarly situated people received shorter terms of incarceration for similar, if not worse, conduct. A sentence of time served will also promote respect for the law. As stated above, Mr.

Kamash has not gone unpunished for his offense; the time he has spent incarcerated demonstrates that his decision to break the law carries heavy consequences.

On top of that, the weight of this case has taken a toll on his family in ways that cannot be measured by incarceration. Since they are dependent on Mohamed, his family has struggled financially since the start of the case. Mr. Kamash has been unable to travel to Turkey to see his wife and son, who Mr. Kamash has not seen since he was three months old. He was not able to be there when his son was hospitalized with RSV, nor has he been able to provide full emotional support to his wife who is navigating becoming a parent and caring for a sick child in a foreign country all alone. Mr. Kamash's actions have jeopardized his family's ability to come to the United States, throwing into question their family's future and safety. If Mr. Kamash's family is deported from Turkey back to Iraq, they will likely face retaliation from the Iran-backed, Shi'a group named Hashd al-Shaabi, known as the Popular Mobilization Units (PMU), due to Ali and Ahmed's involvement with ISIS, even though Mr. Kamash's mother and younger brothers themselves had no involvement.[66] The PMU emerged in 2014 to fight against ISIS, and people referred to the "brutally-sectarian militia" as "Shi'a-ISIS."[67] When ISIS was defeated in December 2017, the PMU integrated into the Iraqi military and government.[68] As the pendulum of Shi'a-Sunni power in Iraq swings back to a Shi'a government, Sunni Muslims, especially those with any familial ties to ISIS, are in an extremely vulnerable position.

---

[66] In 2016, Qais al-Khazali, the leader of the feared Asaib Ahl al-Haq Shi'a militia said, "we are coming to Tal Afar to avenge Hussein," ominously linking the retaking of Tal Afar with the martyrdom of the Imam Hussein in the seventh century. In Shi'a terms, there can be no clearer statement of sectarian intent. https://www.wilsoncenter.org/sites/default/files/media/documents/publication/the_looming_problem_of_tal_afar.pdf

[67] Fanar Haddad, Report, *Understanding Iraq's Hashd al-Sha'bi: State and Power in Post-2014 Iraq*, Century International (Mar. 5, 2018) https://tcf.org/content/report/understanding-iraqs-hashd-al-shabi/.

[68] *Shiites the Big Winners in Iraq Since US Toppled Saddam*, FRANCE24 (Mar. 17, 2023, 4:22 PM) https://www.france24.com/en/live-news/20230317-shiites-the-big-winners-in-iraq-since-us-toppled-saddam.

Given the extreme consequences Mr. Kamash and his family have faced because of Mr. Kamash's actions, any more imprisonment would be unnecessary. *United States v. Stewart*, 590 F. 3d 93, 141 (2d Cir. 2009) ("[I]t is difficult to see how a court can properly calibrate a 'just punishment' if it does not consider the collateral effects of a particular sentence."); *see also United States v. Nesbeth*, 188 F. Supp. 3d 179, 180 (E.D.N.Y. 2016) ("[S]ufficient attention has not been paid at sentencing . . . to the collateral consequences facing a convicted defendant. There is a broad range of collateral consequences that serve no useful function other than to further punish criminal defendants . . . . Many—under both federal and state law—attach automatically upon a defendant's conviction. The effects of these collateral consequences can be devastating.").

C.  <u>Mr. Kamash has been deterred and does not pose a threat to the public.</u>

Mr. Kamash has been deterred. It has been three years since the offense, and Mr. Kamash has not reoffended. Far from it, he has established a respectful and engaged relationship with counsel and the United States Probation Office. This fact demonstrates that the current conditions are working and that more restrictive conditions, like incarceration, are not necessary to prevent re-offense.

Mr. Kamash is not a danger to the public. His offense was situational arising out of a deep-seated fear that he would lose his ability to remain in the United States and he would get sent back to a country where he fears for his life. As a result of his crime, he is likely to be removed and returned to the country that oppressed him where he will again not be a danger to the public.

Mr. Kamash has never had any involvement with the criminal system and has never served any term of imprisonment prior to his arrest in this case. PSR ¶¶ 56-61. Mr. Kamash's lack of criminal history and record of perfect compliance while on pre-trial release make him a low risk to the public and weigh in favor of a sentence of time served. In *United States v. Mishoe*, 241 F.3d 214, 220 (2d Cir. 2001), the Second Circuit stated: "Obviously, a major reason for imposing an especially long

sentence upon those who have committed prior offenses is to achieve a deterrent effect that the prior punishments failed to achieve. That reason requires an appropriate relationship between the sentence for the current offense and the sentences . . . for the prior offenses."

While the *Mishoe* decision principally addressed the Career Offender Guidelines, the teaching of that decision applies here. Specifically, the concept of incremental punishment is relevant to the sentencing goal of deterrence. Where an individual has never been incarcerated before, a noncustodial sentence may be adequate in providing deterrent effects. *See also United States v. D.M.*, 942 F. Supp. 2d 327, 339 (E.D.N.Y. 2013) (sentencing a defendant to probation partially because his lack of criminal history suggests "that he is of low risk of re-offense"); *United States v. Aref*, 2007 WL 804814 at *3 (N.D.N.Y. 2007) ("Based upon [defendant's] lack of prior criminal history, and his personal characteristics, the Court finds his circumstances to be extraordinary and that a downward departure is warranted to a criminal history category of I.").

In Mr. Kamash's case, the concept of incremental punishment applies. Before May 2022, Mr. Kamash had never been incarcerated. The two months he spent at Wyatt were harsher for him than the average experience of two months of incarceration. Mr. Kamash also had over two years on restrictive GPS monitoring. Throughout, Mr. Kamash has maintained a perfect record. The combination of two months at Wyatt, and over two years on restrictive conditions of release, are just as effective (if not more effective) in promoting deterrence for Mr. Kamash as an additional period of imprisonment. There is no reason to suggest that an additional period of incarceration is necessary. Mr. Kamash has suffered consequences for his actions, and he has learned his lesson.

In addition, a Criminal History Category of I does not adequately reflect Mr. Kamash's complete lack of any criminal justice involvement, since Category I includes those with some criminal history, as well as those with arrests that did not result in imprisonment. For those who have had zero

criminal justice involvement of any kind, the risk of recidivism is actually lower than others in Category I. The two-level reduction applied to "zero-point offenders," while certainly necessary, is not necessarily sufficient to reflect the full weight of zero criminal history. *See United States v. Germosen*, 473 F. Supp. 2d 221, 227 (D. Mass. Jan. 18, 2007). In *Germosen*, the District Court, imposed a below-Guidelines sentence based upon aberrant behavior, lack of criminal history, and recidivism statistics from the United States Sentencing Commission. *See United States v. Germosen*, 473 F. Supp. 2d 221, 227 (D. Mass. Jan. 18, 2007). The court noted that "[m]inimal or no prior involvement with the criminal justice system is a powerful predictor of a reduced likelihood of recidivism." *Id.*[69] In a 2017 study, the Sentencing Commission determined that "Criminal history score and Criminal History Category (CHC) are strong predictors of recidivism."[70] In addition, "[o]ffenders with zero criminal history points had a lower rearrest rate than offenders with one criminal history point (30.2% compared to 46.9%) . . . ."[71] Finally, the Commission concluded that, "[o]ffenders with zero criminal history points and no prior contact with the criminal justice system had an 11.7 percentage point lower recidivism rate than offenders with zero criminal history points and some prior contact with the criminal justice system, such as arrests or convictions that do not receive points (25.7% compared to 37.4%)."[72]

As for general deterrence, it is not clear that the severity of a sentence (as opposed to the certainty of the imposition of some sentence) has any significant general deterrent value. *See United*

---

[69] The court cited: United States Sentencing Commission, A Comparison of the Federal Sentencing Guidelines Criminal History Category and the U.S. Parole Commission Salient Factor Score, 15 (Jan. 4, 2005), http//www.ussc.gov/publicat/RecidivismSalientFactorCom.pdf.).

[70] *The Past Predicts the Future: Criminal History and Recidivism of Federal Offenders*, U.S. SENTENCING COMMISSION, at 6 (Mar. 2017), https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2017/20170309_Recidivism-CH.pdf#page=12 (last visited July 25, 2024).

[71] *Id.*

[72] *Id.*

*States v. Bannister*, 786 F. Supp. 2d 617, 658 (E.D.N.Y. 2011) ("Except for the incapacitation effect of incarceration, there is little apparent correlation between recidivism and the length of imprisonment."). Typical of the findings on general deterrence are those of the Institute of Criminology at Cambridge University.[73] The report, commissioned by the British Home Office, examined penalties in the United States, as well as several European countries. It examined the effects of changes to both the *certainty* and the *severity* of punishment. While significant correlations were found between the certainty of punishment and crime rates, the "correlations between sentence severities and crime rates . . . [were] not sufficient to achieve statistical significance."[74] The report concludes that the studies reviewed do not give much support to the hypothesis that increasing sentence severity enhances deterrent effects.[75]

    D.  <u>A sentence of time served would reflect Mr. Kamash's extraordinary post-offense efforts at rehabilitation.</u>

Mr. Kamash's remarkable post-offense rehabilitative conduct provides further grounds for a sentence of time served. Following his release from Wyatt, Mr. Kamash immediately and willingly sought treatment for his mental health. He has worked on strategies for addressing his symptoms of stress and anxiety, including headaches, muscle pain, and difficulty sleeping. Exhibit B (Brooke Conley's Letter to the Court). When reflecting upon his actions, Mr. Kamash has expressed his deep remorse for what he has done. He fully understands the gravity of his choice and apologizes to the Court.

---

[73] ANDREW VON HIRSCH ET AL., CRIMINAL DETERRENCE AND SENTENCE SEVERITY: AN ANALYSIS OF RECENT RESEARCH (1999).
[74] *Id.* at 45.
[75] *Id.* at 27; 45-48.

His actions demonstrate his rehabilitation as well. Mr. Kamash's respect for the law is reflected in his perfect compliance with his conditions since he was released. He has been an upstanding, responsible member of the community. In the face of adversity over the past two years, Mr. Kamash has handled each challenge with perseverance and unwavering respect for Probation, defense counsel, and the Court.

The Second Circuit has recognized consistently that the Guidelines have not always adequately considered rehabilitation efforts. *See United States v. Core*, 125 F.3d 74, 76 (2d. Cir. 1997); *see also United States v. Douglas*, 713 F.3d 694, 703 (2d Cir. 2013) (stating that "[w]e do not hold that district courts may not approach cases of addicted defendants who seek treatment and show promise of changing their lives with compassion and with due consideration of the relative costs and effectiveness of treatment versus long prison sentences"). Thus, the Court of Appeals has authorized departures for post-offense drug rehabilitation, *United States v. Maier*, 975 F.2d 944 (2d Cir. 1992); post-arrest non-drug rehabilitation, *United States v. Workman*, 80 F.3d 688 (2d Cir. 1996); rehabilitation while serving a prison sentence, *United States v. Core*, 125 F.3d 74 (2d Cir. 1997); and for the achievement of the ordinary responsibilities of citizenship that is the product of substantial commitment sustained over time, *United States v. Bryson*, 163 F.3d 742, 748 (2d Cir. 1998). In reaching these decisions, the Second Circuit has observed that the "awareness of one's circumstances and the demonstrated willingness to act to achieve rehabilitation, thereby benefitting the individual and society, can remove a case from the heartland of typical cases, thus constituting a valid basis for departure." *United States v. Core*, 125 F.3d at 76 (citations omitted). The reasoning behind these departures is the recognition that rehabilitation is a valuable goal.

> [P]recluding departures regardless of anything constructive the defendant might do after his arrest that benefits himself, his family, or his community, undermines the statutory standard for departures, 18 U.S.C. § 3553(b), as well

as the statutory requirement to consider the "characteristics of the defendant," *id.*

§ 3553(a)(1).

> The successful rehabilitation of a criminal, on the other hand, is a valuable achievement of the criminal process. The [Sentencing Reform] Act recognizes this by requiring sentencing courts to consider "the need for the sentence imposed . . . to provide the defendant with needed educational, vocational training . . . or other correctional treatment [in the most effective manner]."

18 U.S.C. § 3553(a)(2)(D).

*United States v. Core*, 125 F.3d at 77. Additionally, the Second Circuit has recognized downward departures to facilitate successful rehabilitation is consistent with just punishment and retribution because rehabilitation symbolizes an offender's desire to return and reintegrate into society. *See United States v. K*, 160 F. Supp. 2d 421, 441 (2d Cir. 2001).

Courts in the District of Connecticut have departed downward from the Guidelines on this basis. *United States v. Thomas Recck*, 3:15-cr-15 (JAM), Transcript (Doc. No. 42) at 76; *United States v. James Cave*, 3:15-cr-83(JAM), Transcript (Doc. No. 64) at 51. Other courts in this district have also departed/varied downward based on post offense efforts at rehabilitation. *See, e.g.*, Judgment, *United States v. Staggers*, 3:18-cr-183 (JCH), Doc. No. 99 (D. Conn. Mar. 24, 2019) (Hall, J.) (imposing non-Guidelines sentence with variance based on "the defendant's post-arrest conduct and his extraordinarily rehabilitation"); Judgment, *United States v. Balducci*, 3:12-cr-249 (AWT), Doc. No. 35 (D. Conn. Apr. 8, 2013) (Thompson, J.) (departing downward for "extraordinary efforts at rehabilitation" and citing Maier decision).

Here, Mr. Kamash is not asking for a downward departure from the Guidelines—he is asking for a Guidelines sentence of time served. Thus, Mr. Kamash's spotless record on pre-trial release should serve as a ground for imposing time served and nothing more.

36

E.  <u>The Court should consider Mr. Kamash's family responsibilities and history of employment.</u>

Family ties and responsibilities is a well-recognized ground for departure and/or variance. In this case, no departure or variance is needed, however, the Court should consider family ties as a § 3553 factor. The commentary to § 5H1.6 of the Guidelines was amended in 2003. The amendments in USSG § 5H1.6, comment. n.1(B), provide:

> <u>Departures Based on Loss of Caretaking or Financial Support</u>: A departure under this policy statement based on the loss of caretaking or financial support of the defendant's family requires, in addition to the court's consideration of the non-exhaustive list of circumstances in subdivision (A), the presence of the following circumstances:
>
> > (i) The defendant's service of a sentence within the applicable guideline range will cause a substantial, direct, and specific loss of essential caretaking, or essential financial support, to the defendant's family.
> >
> > (ii) The loss of caretaking or financial support substantially exceeds the harm ordinarily incident to incarceration for a similarly situated defendant. For example, the fact that the defendant's family might incur some degree of financial hardship or suffer to some extent from the absence of a parent due to incarceration is not in itself sufficient as a basis for departure because such hardship or suffering is of a sort ordinarily incident to incarceration.
> >
> > (iii) The loss of caretaking or financial support is one for which no effective remedial or ameliorative programs reasonably are available, making the defendant's caretaking or financial support irreplaceable to the defendant's family.
> >
> > (iv) The departure effectively will address the loss of caretaking or financial support.

Notably, courts have suggested that the family circumstances departure is intended to benefit the family of the defendant, and not necessarily the defendant herself. *See, e.g., United States v. Galante*, 111 F.3d 1029, 1035, 1037 (2d Cir. 1997). A sentencing court granting such a departure recognizes that there are costs to others that can outweigh any societal benefit to be gained by incarcerating the defendant. This Circuit has consistently deferred to the judgment of the district courts as to whether

37

the circumstances of a particular case justify such a departure. *See, e.g., United States v. Galante*, 111 F.3d 1029 (2d Cir. 1997) (Second Circuit upheld district court's departure. District court had relied on findings that defendant-father was primary caretaker and financial support for family, that wife's job prospects were limited, and that children would be adversely impacted in terms of their education and upbringing without him); *United States v. Alba*, 933 F.2d 1117 (2d Cir. 1991) (defendant, wife, two children and grandmother all lived with defendant's disabled father, who depended on defendant to help him get in and out of wheelchair - loss of defendant would risk destruction of strong family unit); *United States v. Johnson*, 964 F.2d 124 (2d Cir. 1992) (defendant solely responsible for upbringing of three children and grandchild). Moreover, there is consensus that the single most important factor in preventing recidivism may very well be employment.[76]

The record evidence demonstrates that Mr. Kamash meets the circumstances in the policy statement to § 5H1.6, and in any event, no departure or variance is needed here, and the Court has the authority to impose a sentence of time served and should do so. Mr. Kamash is the sole financial caretaker for his wife and son. Exhibit C (Fadila Kamash's Letter to the Court); Exhibit D (Muna Ahmed's Letter to the Court); Exhibit F (Noha Kamash's Letter to the Court). They rely on him fully for financial support, which includes the cost of getting his son life-saving medical care in a country where hospitals can turn him away. Mr. Kamash also financially supports his mother and younger brothers who live in Turkey. He sends money for their basic needs, including food and shelter. His mother and brothers also face deportation from Turkey, since they fled the war in Iraq and do not have the proper documentation. For them, deportation could be a death sentence—the group in control

---

[76] Findings on Best Practices of Community Re-entry Programs for Previously Incarcerated Persons, available at http://www.eisenhowerfoundation.org/docs/Ex-Offender%20Best%20Practices.pdf, at 8.

of Mosul is angry at Mr. Kamash's other brothers and would likely retaliate by hurting his mother and younger brothers. Given the potentially deadly consequences, Mr. Kamash also pays for a lawyer to help his family fight deportation so that they can remain in Turkey. Providing for his family's financial needs far outweighs the retributive goal of sentencing to punish Mr. Kamash with a further sentence of incarceration.

Although employment is not "ordinarily relevant" to the determination of a sentence, USSG § 5H1.5, the Second Circuit has held that it is an appropriate basis for a downward departure in exceptional or extraordinary cases, particularly where other bases for departures are present. *United States v. Jagmohan*, 909 F.2d 61, 65 (2d Cir. 1990) (considering immigrant's nine-year employment history as a basis for departure in combination with other factors). Mr. Kamash has an extraordinary record of employment. The combination of Mr. Kamash's history of employment and his family responsibilities weighs in favor of a sentence of time served.

IV.    **Given Mr. Kamash's family circumstances, a one-year term of supervised release would be appropriate.**

By law, the Court may impose a supervised release term of not more than three years. 18 U.S.C. § 3583(k); USSG § 5D1.2(b). Yet, a supervised release term is not presumed reasonable simply because it complies with the Guidelines. *See United States v. Jenkins*, 854 F.3d 181, 194 (2d Cir. 2017) ("While this term of supervised release does not violate the Guidelines or the Policy Statement of § 5D1.2(b)(2), we may not presume the reasonableness of the sentence on that basis."). When determining the length of a supervised release term, a district court must consider "the nature and circumstances of the offense and the history and characteristics of the defendant" and "the need for the sentence imposed" to serve the goals of deterrence, public safety, rehabilitation and treatment. 18 U.S.C. §§ 3583(c), 3553(a). Punishment is not a valid consideration. *See* 18 U.S.C. § 3553(a)(2)(A).

Mr. Kamash respectfully requests that the Court impose a supervised release term of one year. As discussed, Mr. Kamash has been deterred and does not pose a threat to public safety. He, at no point, posed a threat to public safety and the severe consequences that he has suffered from his actions have clearly deterred Mr. Kamash from committing further offenses.

A supervised release term longer than one year would impede, rather than advance, Mr. Kamash's rehabilitation. "Supervised release fulfills rehabilitative ends, distinct from those served by incarceration." *United States v. Johnson*, 529 U.S. 53, 53-54 (2000); *see also United States v. Haymond*, 139 S. Ct. 2369, 2382 (2019) ("[S]upervised release wasn't introduced to replace a portion of the defendant's prison term, only to encourage rehabilitation after the completion of his prison term."). A supervised release term is not intended to punish, but rather to "ease the defendant's transition back into the community."[77] Here, Mr. Kamash has been doing well in the community—he has worked consistently and complied fully with all of his release conditions. Mr. Kamash also does not require a longer term on supervised release to facilitate treatment, since he has already successfully completed the recommended treatment programs.

With deterrence, public safety, rehabilitation, and treatment in mind, it is clear that Mr. Kamash does not require more than one year on supervised release. Given Mr. Kamash's family circumstances, there are strong reasons in favor of a shortened term of supervised release. Because of this case, Mr. Kamash has been unable to travel to Turkey to see his wife and son. He last saw his son when his son was only three months old, and he has not been able to hug his son for over two years. A one-year term of

---

[77] S. Rep. No. 98-225, at 124 (1983) ("The Committee has concluded that the sentencing purposes of incapacitation and punishment would not be served by a term of supervised release - that the primary goal of such a term is to ease the defendant's transition into the community after the service of a long prison term for a particularly serious offense, or to provide rehabilitation to a defendant who has spent a fairly short period in prison for punishment or other purposes but still needs supervision and training programs after release.").

supervised release would allow Mr. Kamash to see his son before his son's fourth birthday. Thus, the defense submits that a supervised release term longer than one year would only function to punish Mr. Kamash and further harm his family.

**CONCLUSION**

Mr. Kamash has been punished for his actions. He is deeply remorseful and has worked hard to keep his life on track so that he can reunite with him family soon. Mr. Kamash respectfully requests that the Court impose a Guidelines sentence of time served (equivalent to approximately two months of imprisonment), followed by a one-year term of supervised release.

Respectfully Submitted,

THE DEFENDANT,
Mohamed Kamash

FEDERAL DEFENDER OFFICE

Date: July 26, 2024

/s/ Kelly M. Barrett
Kelly M. Barrett
First Assistant Federal Defender
265 Church Street, Suite 702
New Haven, CT 06510
Phone: (203) 498-4200
Bar No.: ct27410
Email: kelly_barrett@fd.org

/s/ Carly Levenson
Carly Levenson
Assistant Federal Defender
265 Church Street, Suite 702
New Haven, CT 06510
Phone: (203) 498-4200
Bar No.: pvh09665
Email: carly_levenson@fd.org

Assisting on the Brief

Avital Fried
Legal Intern

41

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on July 26, 2024, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

*/s/ Kelly M. Barrett*
Kelly M. Barrett